**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

ERIE INSURANCE EXCHANGE                              *
100 Erie Insurance Place
Erie, Pennsylvania 16530                             *

ERIE INSURANCE COMPANY                               *
100 Erie Insurance Place
Erie, Pennsylvania 16530                             *

ERIE INSURANCE PROPERTY AND                          *
CASUALTY COMPANY
100 Erie Insurance Place                             *
Erie, Pennsylvania 16530
                                                     *
ERIE FAMILY LIFE INSURANCE
COMPANY                                              *
100 Erie Insurance Place
Erie, Pennsylvania 16530                             *

ERIE INSURANCE COMPANY OF                            *
NEW YORK
120 Corporate Woods, Suite 150                       *
Rochester, New York 14623
                                                     *
FLAGSHIP CITY INSURANCE COMPANY
144 East 6th Street                                  *
Erie, Pennsylvania 16530
                                                     *
       Plaintiffs
                                                     *
v.
                                                     *
THE MARYLAND INSURANCE
ADMINISTRATION                                       *
200 St. Paul Place, Suite 2700
Baltimore, Maryland 21202                            *

KATHLEEN A. BIRRANE                                  *
Maryland Insurance Commissioner
Maryland Insurance Administration                    *
200 St. Paul Place, Suite 2700
Baltimore, Maryland 21202                            *

Defendants
                              *
*     *     *     *     *     *     *     *     *     *     *     *     *     *

## COMPLAINT

Plaintiffs Erie Insurance Exchange, Erie Insurance Company, Erie Insurance Property & Casualty Company, Erie Family Life Insurance Company, Erie Insurance Company of New York, and Flagship City Insurance Company (collectively "Plaintiffs" or "Erie"), by and through undersigned counsel, file this Complaint against Defendants the Maryland Insurance Administration ("MIA" or "Administration") and Maryland Insurance Commissioner Kathleen A. Birrane (the "Commissioner"), and state as follows:

## INTRODUCTION

1.      The Maryland Insurance Administration and Commissioner have publicly issued four unlawful determination letters ("Determination Letters") against Erie.

2.      Each of the Determination Letters illegally publicizes Erie's confidential business information, attorney-client privileged information, and work product protected information in direct violation of Section 2-209 of the Insurance Article to the Maryland Annotated Code ("Ins." or "Article"), Maryland common law, and "long standing" privileges and protections applied and enforced by the Administration – ***including in this very Court***.

3.      The Insurance Administration and Commissioner arbitrarily and capriciously rushed publication of the Determination Letters based on an incomplete investigation, for reasons other than legitimate insurance regulatory purposes.

4.      The Determination Letters were rushed because the businesses that had filed administrative discrimination complaints against Erie grew impatient of waiting for the

2

Administration to complete the "thorough" years-long investigation that the MIA had determined was required for the complex issues presented by the administrative complaints.

5.     During their wait, two of the complainants filed separate civil lawsuits against Erie. Both were dismissed.

6.     At the time those cases were dismissed, the Administration had not completed its purportedly "thorough" investigation.  In fact, the opposite was true: the MIA had agreed to a *de facto* stay of the investigation in which the Determination Letters were issued.

7.     Yet, in May 2023, the MIA and Commissioner acted arbitrarily, capriciously and unlawfully, and with improper purpose, by issuing the surprise Determination Letters: (1) in an unfounded reversal of the Administration's position that the investigation was subject to a *de facto* stay; (2) without the MIA having completed the investigation; (3) with the Administration ignoring Erie's offer to provide additional information while the MIA falsely states in three of the Determination Letters that Erie had not offered to provide the information; and by (4) "filling" factual gaps in the incomplete investigation by illicitly and publicly revealing confidential, privileged and protected information.

8.     Erie had no notice of the Administration's and Commissioner's intent to make the illegal disclosures and misstatements until after the Determination Letters had been publicly issued. The Administration and Commissioner have thus violated Erie's federal and State due process rights.

9.     Erie is entitled to: (1) a Temporary Restraining Order ("TRO") and preliminary injunctive relief prohibiting Defendants from further disseminating Erie's confidential, privileged and protected information in the Determination Letters or otherwise; (2) a permanent, mandatory injunction directing the Administration and Commissioner to withdraw the unlawful Determination

Letters and prohibiting any further dissemination of Erie's confidential, privileged and protected materials; and (3) a declaration of this Court that the Determination Letters are unlawful.

## PARTIES

10.     Erie Insurance Exchange is a reciprocal insurance exchange registered to do business in Maryland and is licensed in Maryland by the Administration.

11.     Erie Insurance Company is an insurance company registered to do business in Maryland and licensed in Maryland by the MIA.

12.     Erie Insurance Property & Casualty Company is an insurance company registered to do business in Maryland and licensed in Maryland by the MIA.

13.     Erie Family Life Insurance Company is an insurance company registered to do business in Maryland and licensed in Maryland by the MIA.

14.     Erie Insurance Company of New York is an insurance company registered to do business in Maryland and licensed in Maryland by the MIA.

15.     Flagship City Insurance Company is an insurance company registered to do business in Maryland and licensed in Maryland by the MIA.

16.     Defendant MIA is an administrative agency of the State of Maryland.  The Administration is a remedial administrative agency that regulates the business of insurance in Maryland.

17.     Defendant Kathleen A. Birrane is the Maryland Insurance Commissioner and the current head of the Administration.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question). This Court has supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a)

over all other claims asserted in this Complaint because those claims are so closely related to the federal claims asserted herein as to form part of the same case and controversy.

19.     This Court has personal jurisdiction over all Defendants because all Defendants either reside in the State of Maryland; regularly transact, conduct, or solicit business in Maryland; or engage in other persistent courses of conduct or derive substantial revenue from services rendered in Maryland.

20.     This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of or domiciled in the State of Maryland.  This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims set forth herein occurred in the State of Maryland.

**FACTS COMMON TO ALL COUNTS**

### I.     Four Current And Former Erie Agents Filed Administrative Complaints Against Erie.

21.     Each Erie Plaintiff is active and fully licensed by the MIA to operate as an insurance company within the State of Maryland.  Each Plaintiff maintains a license to operate as an insurance company and has maintained such license at all relevant times.  Each Plaintiff maintains a property interest in its respective Maryland license.

22.     On or about January 2021, former Erie agencies Ross Insurance Agency, Inc. ("Ross") and Welsch Insurance Group LLC ("Welsch"), as well as current Erie agency Baltimore Insurance Network, LLC ("BIN") filed administrative complaints against Erie with the MIA.

23.     Current Erie agency Burley Insurance & Financial Services, Inc. ("Burley") filed a complaint against Erie with the Administration on or about December 2021.

24.     The Ross, Welsch, BIN and Burley administrative complaints (collectively the "Administrative Complaints") allege that Erie engaged in racial and geographic discrimination.

**II.      The Administration Opened Two Separate And Independent Investigations Concerning The Allegations In The Administrative Complaints.**

25.      The MIA informed Erie that the Administration was exercising its statutory authority to open two separate administrative investigations of the allegations contained in the Administrative Complaints.

26.      First, the Administration opened a broad market conduct examination ("Market Conduct Examination") into Erie's conduct in the Maryland insurance market generally, pursuant to title 2, subtitle 2 of the Maryland Insurance Article ("Article").   The Market Conduct Examination was referred to by the parties as the "Phase I" examination.

27.      Second and separately, the MIA opened a more specific licensing investigation ("Licensing Investigation") of the allegations Ross, BIN, Welsch, and Burley made in their respective Administrative Complaints pursuant to Title 10 of the Article.   The Licensing Investigation was referred to by the parties as "Phase II."

**III.      The MIA Misrepresented To Erie, For More Than Two Years, That The Administration Would First Conduct And Complete The Phase I Market Conduct Examination, And Only Then Turn Its Attention To The Phase II Licensing Investigation, Which Was Purportedly Subject To A *De Facto* "Stay."**

28.      In the aftermath of the January 2021 filing of the first three Administrative Complaints, the Administration contacted Erie and pursued the Market Conduct Examination.  MIA Market Conduct Examiners requested documents and interviews from Erie.

29.      The MIA misrepresented to Erie, in 2021, the vast majority of 2022 and then again in 2023, that the Phase II Licensing Investigation was subject to a *de facto* "stay," or on hold, pending completion of the Phase I Market Conduct Examination.

30.      The sole inquiries Erie received in the Licensing Investigation during this period were a set of five written questions that the P&C Division issued in 2022 concerning the Ross, BIN and

Welsch Administrative Complaints, and two sets of questions concerning the Burley Complaint. At the time that the P&C Division issued these questions, the Market Conduct Examination was in full swing under the purview of the MIA's Market Regulation Division.

31.    Erie provided limited written responses to the Burley questions in February 2022,[1] and to the Ross, BIN and Welsch questions in March 2022.  Those preliminary February and March 2022 responses expressly contemplate further discussions and interviews with the Administration once the MIA lifted the *de facto* stay that the Administration had implemented.

32.    Erie's responses contemplated further action with the MIA, including interviews.

33.    The Administration misrepresented to Erie that the Licensing Investigation would be "completed" when Phase II was resumed, to include the conducting of interviews as well as the submission of additional documents and information, after conclusion of the Phase I Market Conduct Examination.

34.    As of May 24, 2023, Erie had not received a draft Market Conduct Examination report from the MIA and was awaiting further communication from the Administration concerning the Market Conduct Examination.

35.    Erie was not expecting any communication from the Administration concerning the Licensing Investigation because the Market Conduct Examination was not complete, and the "stay" of the Licensing Investigation remained in place.

---

[1] Erie received a single additional written request on July 6, 2022 requesting information related to "any improvements made by [Burley] resulting in the commissions returning to their prior level." Erie responded to this inquiry on July 18, 2022, explaining that the three issues identified in Erie's September 4, 2019 Warning and Commission Reduction letter (poor underwriting practices, unacceptable policyholder service, and lack of engagement) continued to persist.  Erie did not receive any follow-up or response to its July 2022 response from the Administration.

36.     Erie never received any response or follow-up from the Administration concerning its 2022 responses to the P&C Division's written questions regarding BIN, Welsch and Ross.

37.     Erie **never** participated in an interview with any P&C Division investigator.

## IV.    The P&C Division Issued The Four Unlawful Determination Letters On May 24, 2023.

38.     On May 24, 2023, the P&C Division and Commissioner suddenly, arbitrarily, capriciously and with improper motive surprised Erie by issuing the four public Determination Letters in the purportedly "stayed" Licensing "Investigation" without having first conducted the complete Licensing Investigation that the MIA had previously determined, in an exercise of its administrative authority, was required.

39.     The Determination Letters issued in the **_Licensing Investigation_** contain confidential business information and materials the MIA collected in the **_Market Conduct Examination_**, in violation of § 2-209(g) of the Article, Maryland caselaw, and "long standing" Administration privilege and policy.

40.     The Determination Letters also contain Erie's attorney-client privileged and work product protected information.

41.     In some cases, the documents the Administration relies on and quotes in the Determination Letters **_were not even "produced" by Erie in the Market Conduct Examination_**. These documents were not "produced" by Erie but appear to be obtained by the MIA through searches in Erie's systems. ERIE believes this action exceeded the scope of the granted system access based on the system training Erie provided them.

42.     P&C Division determination letters are routinely signed by the P&C Division investigator assigned to the case. The Determination Letters at issue here were signed by the

Associate Commissioner of the P&C Division, and **_not_** the investigator that the MIA assigned to the four cases.

43.    Erie had **_no_** opportunity to object to the Administration's illegal inclusion of the confidential, privileged and protected information and materials improperly included in the public Determination Letters.

## V.    The P&C Division's Failure To Complete Its Investigation Prior To Issuing The Determination Letters Is Arbitrary, Capricious And Highly Prejudicial To Erie.

44.    The Determination Letters contain "findings" based on non-existent Erie "failures" to provide certain information to the MIA.  These non-existent "failures" were caused solely and exclusively by the MIA's abrupt abandonment its oft-repeated intent to complete the Licensing Investigation.

45.    By way of example only, one of the P&C Division's five written questions in the Ross, BIN and Welsch matters asked Erie to describe, in writing, measures or guidelines Erie uses to determine whether an insurance agency is in compliance with or meeting the requirements of an Erie agency agreement.

46.    Erie responded that Erie's Agency Agreement "creates many duties and obligations and there are many ways that we identify failure to comply with those duties, a large number of which are informal (e.g. we receive a customer complaint that pertains to agency conduct and in the process of examining the matter, we may uncover misconduct by the agent or breach of the Agency Agreement). *As the situations could be numerous, many of which may be unique, it would be very difficult to list or even identify every possible situation.  After you have had the opportunity to review the included Agency Agreement (Exhibit A), if there is a specific provision*

*you would like additional information on, please let us know and we can prepare a more specific response to your Inquiry 4*."[2]

47.     The Administration *never* followed up with Erie to discuss any of the numerous or unique ways that Erie identifies failures to comply with Erie agency agreements.  The MIA never "let [Erie] know" which provision of the agency agreement was at issue.  The Administration never discussed the issue with Erie, nor did the P&C Division interview anyone from Erie concerning this issue.

48.     Instead, the P&C Division issued four Determination Letters which contain the patently false statement that "[w]ith the exception of measuring the frequency of customer complaints, *Erie provides no* objective standard for any of the other factors it considers during its agency reviews; and importantly, *Erie offers no* objective connection between any of these metrics and profitability or performance." (emphasis added).

49.     Erie *did*, in fact, "offer" "additional information" and a more "specific response" on this very question – but the Administration never followed up with Erie to engage in the promised communications, including interviews, that the MIA misrepresented to Erie would be conducted when the Market Conduct Examination was completed – per the MIA's own Phase I/Phase II timeline.

50.      The Administration has not provided any explanation of any legitimate purpose (because there is none) for the MIA's: (1) abandonment of its Phase I/Phase II framework; (2) failure to conduct the promised interviews and communications; (3) failure to engage Erie or

---

[2] The MIA sent this same written question to Erie in connection with the Ross, BIN and Welsch Administrative Complaints.  Erie's response was the same to all three questions.  The Administration sent fewer, but similar questions to Erie concerning Burley in two tranches.  The MIA never followed up on Erie's limited Burley responses either.

otherwise respond to Erie's requests for clarification of questions;  (4) misrepresentation in the Determination Letters that Erie had failed to offer information that Erie had specifically offered to the Administration; nor its (5) illicit use of confidential information from an incomplete Market Conduct Examination in the Determination Letters.

**VI.** **The Phase I Market Conduct Examination And The Phase II Licensing Investigation Are Separate And Independent Matters, Authorized By Different Statutes, Conducted By Different MIA Divisions – And Most Critically Are Subject To Materially Different Confidentiality Protections.**

51.      As the Administration explains in identical language in each of its four Determination Letters, the MIA's rulings described in the Determination Letters issued in the Licensing Investigation "are focused solely" on the actions taken by Erie with respect to Ross, BIN, Welsch and Burley, respectively.

52.      The MIA further explains that "***separate from***" the Licensing Investigation, "the Insurance Administration has undertaken a [M]arket [C]onduct [E]xamination of Erie.  To the extent that the actions taken by Erie described [in the Determination Letters] are part of a larger pattern of conduct and are the subject of the aforementioned market conduct examination, additional violations related to such actions may be found and Erie may be subject to additional findings, orders and penalties."  *Id.* (emphasis added).

53.      There is different statutory authority for the Market Conduct Examination and the Licensing Investigation, as noted above.

54.      The Administration and Commissioner assigned the MIA's Market Regulation Division to conduct the Market Conduct Examination.

55.      By contrast, the Administration's Associate Commissioner for the MIA's P&C Division issued and signed the Determination Letters in the Licensing Investigation.

**VII.    The Administration Is Obligated By § 2-209 Of The Article, Maryland Caselaw, Privilege, And "Long Standing" MIA Practice To Maintain The Confidentiality Of All Of The Market Conduct Investigation Materials.**

56.    Title 2, subtitle 2 of the Insurance Article provides substantial confidentiality protections to market conduct materials, including documents gathered as part of the market conduct investigation process.  Article § 2-209; *Chinwuba v. Larsen*, 142 Md. App. 327 (2002), *rev'd. in part on other grounds*, *Larsen v. Chinwuba*, 377 Md. 92 (2003); *Nagy v. Baltimore Life Ins. Co.*, 49 F.Supp.2d 822, 825-26 (1999).

57.    There are no comparable confidentiality protections relating to the Licensing Investigation materials.

58.    The statutory confidentiality protections governing market conduct materials are so strong that normally Courts are statutorily prohibited from ordering the Administration to produce market conduct materials in civil litigation.  § 2-209(g)(2).  Specifically, documents and information collected and generated during the Market Conduct Examination, other than a final market conduct report, are: (1) "confidential and privileged"; (2) not subject to production under Maryland's Public Information Act; (3) are "not subject to subpoena"; and (4) are "not subject to discovery or admissible in evidence in any private civil action."  *Id*.

59.    As of the filing of this Complaint, the parties are presently in the "period before the [market conduct] report becomes final," where "there are explicit statutory limits on the type of information that the Commissioner may publicize."  *Chinwuba*, 142 Md. App. at 362, citing § 2-209(g)(2).

**VIII.    Maryland Courts And This Court Have Held That These Market Conduct Confidentiality Protections Are *Vital* – At The Urging Of The Administration.**

60.    Maryland's intermediate appellate court has recognized that there "are important reasons for requiring confidentiality until the MIA completes its investigation and ***affords aggrieved parties the opportunity to challenge*** the charges and findings reflected in the MIA's proposed examination report." *Chinwuba*, 142 Md. App. at 363 (emphasis added).

61.    The Administration deprived Erie of an opportunity to challenge the Administration's disclosure of confidential, privileged and protected materials here because the MIA quoted and described confidential, privileged and protected market conduct materials in the surprise public May 24, 2023 Determination Letters issued in the purportedly "stayed" Licensing Investigation.

62.    The Administration's public release of confidential market conduct materials in the Determination Letters violated the MIA's long-standing construction of § 2-209(g), as described by former Maryland Insurance Commissioner Steven Larsen.  Commissioner Larsen represented to this Court that he was "***prohibited*** by state law from disclosing information concerning ***any matters*** involving preparation of a market conduct report[.]" *Nagy*, 49 F.Supp.2d at 825 (emphasis added).

63.    Subsequently, before Maryland's State intermediate appellate court, Commissioner Larsen again represented that the "MIA construes subsection 2-209(g) [of the Article] as imposing a duty of confidentiality with respect to ***any information***, findings, charges and charges ***that have not been 'tested'*** via the administrative procedures established under 2-209(c)."  *Chinwuba*, 142 Md. App. at 363 (emphasis added).

64.    Commissioner Larsen further represented that "it has been the MIA's 'long standing … practice to protect the confidential[ity] of all preliminary examination reports ***and the documents generated during an examination***."  *Id.*, at 364 (emphasis added).

13

65.     In explaining the MIA's "long standing" practice in *Chinwuba*, Commissioner Larsen explicitly referenced the Commissioner's successful motion to quash a private civil subpoena in *Nagy*, *supra*, because documents the MIA was asked to produce in response to the *Nagy* subpoena "would have disclosed particular concerns that the MIA had expressed about a certain insurer before the MIA's examination report became final." *Id.*, at 363.

66.     In *Nagy*, the MIA successfully moved to protect market conduct documents by arguing that "disclosing information from the period during which the proposed report remained subject to challenge and correction in an administrative hearing would violate subsection 2-209(g) and 'Maryland … decisional authority.'" *Chinwuba*, 142 Md. App. at 363, citing *Nagy*, at 825.

67.     Specifically, an MIA examiner averred, in an affidavit ***to this Court***, that Commissioner Larsen had authorized him to assert "privilege" created by § 2-209(g). *Id.*   The *Chinwuba* court "g[a]ve due weight to the Commissioner's interpretation of subsection 2-209(g) as imposing on [the Commissioner] a ***duty of confidentiality*** in order to ***preserve the right of aggrieved persons to speak freely to the MIA*** during its [market conduct] investigation and the period before the report becomes final, so that they might challenge and correct the MIA's findings ***before the MIA makes public any injurious charges***." *Id.*  (emphasis added).

68.     Upon information and belief, the Administration's current Commissioner, Defendant Birrane, was Principal Counsel to the Insurance Administration at the time the *Chinwuba* decisions were issued.

69.     Here, each of the four Determination Letters incorporates confidential, privileged and protected market conduct materials from a Market Conduct Examination in which no final market conduct report has been issued, in violation of the MIA's longstanding interpretation of § 2-209(g) that the Administration described to this Court in *Nagy* and subsequently adopted in *Chinwuba*.

70.     These Determination Letters contain the very "untested" public "injurious charges" against Erie that the privilege and interpretation of § 2-209(g) described and relied upon by former Commissioner Larsen was designed to prevent.

**IX.     The Administration Concedes That Erie Is Correct On The Confidentiality Statute, Privilege And Protection At Issue Here In A March 2023 Letter.**

71.     On October 4, 2022, Defendant Commissioner Birrane sent a response to a request that the "MIA return to the investigation of the [Administrative] Complaints."  The Commissioner appropriately denied the request and refused to lift the Licensing Examination stay.  Instead, the Commissioner stated that a "thorough" investigation was required of the complex discrimination allegations at issue here. The Commissioner suggested that the complainants may consider civil litigation against Erie.

72.     Ross and Welsch filed suits against Erie.  Both were dismissed.

73.     In March 2023, at approximately the time the Ross suit was dismissed, the Administration received a second request for Market Conduct Materials.

74.     By letter response, counsel to the Administration rejects requests for information and documents related to the ongoing Market Conduct Examination of Erie by stating: "We appreciate your interest in the market conduct examination of Erie.  Pursuant to § 2-209 of the Insurance Article, Annotated Code of Maryland, while a market conduct examination is ongoing, it is confidential. ***This applies not just to the MIA's finding but to all of the materials provided to the MIA during the course of the examination*** … ***While this process is ongoing, the MIA has an obligation to comply with the statutory process***."  (Emphasis added).

75.     This is a correct statement of the law by the Administration's counsel on March 9, 2023.  The MIA violated this statute, and these principles, by publicly releasing the Determination Letters containing confidential, privileged and protected materials just over two months later.

15

**X.   Defendant Birrane Acted With An Improper Purpose And Motive By Directing The Administration To Abandon The Licensing Investigation And To Publicly Disclose Erie's Confidential, Privileged And Protected Information.**

76.     The MIA issued the Determination Letters to Defendants Ross, BIN, Welsch and their respective attorneys, as well as Burley, thereby publicizing them.

77.     Upon information and belief, Defendant Birrane made the decision to reverse the Phase I/Phase II framework that the Administration had originally, and reasonably, exercised its discretion to implement.

78.     As late as April 2023, the Administration represented to Erie that the MIA would soon be issuing a draft market conduct report, pending only a review by Commissioner Birrane as a final step.

79.     Just a few weeks later, the Administration unexpectedly, and without prior warning, reversed the Phase I/Phase II framework it had by then been following for well over two years, and the surprise Determination Letters were issued.

80.     Upon information and belief, Defendant Birrane ordered the abandonment of the Licensing Investigation as well as the Administration's "long standing" interpretation of § 2-209(g), which it has successfully utilized for well over two decades, including in this Court, that documents and information involved in the preparation of a market conduct report are not to be disclosed.

81.     Upon information and belief, as a former Principal Counsel to the Administration, Defendant Birrane was acutely aware of the privileges and protections afforded by § 2-209(g).

82.     Upon information and belief, as a former Principal Counsel to the Administration, Defendant Birrane was acutely aware that the Administration is not permitted to act in an arbitrary and capricious manner, and that as a licensee, Erie is entitled to due process and other constitutional protections under the United States Constitution and Maryland Declaration of Rights.

16

83. The Commissioner knowingly, and with improper purpose, issued public Determination Letters that unlawfully contain Erie Market Conduct Materials, as well as attorney-client privileged and work product protected information.

84. The Commissioner knowingly, and with improper purpose, issued public Determination Letters for other than a good-faith insurance regulatory purpose.

85. The direction to issue unlawful Determination Letters was thus necessarily made willfully, intentionally and with an improper motive and purpose.

86. Erie provided the Administration and Defendant Birrane a substantially similar copy of this lawsuit prior to filing and demanded that the MIA withdraw the Determination Letters due to the patent violations of Maryland insurance law contained in the Determination Letters and described herein.

87. Defendant Birrane and the Administration refused to withdraw the Determination Letters.

88. Erie has filed requests for a hearing on all four Determination Letters.

89. The Administration and Defendant Birrane are each aware that Erie will be substantially prejudiced in the administrative appeals of the Determination Letters because the Administration and Commissioner have chosen to rely on confidential Market Conduct Examination materials, and privileged and protected materials in the Determination Letters.

90. The Administration and Defendant Birrane are each aware that the MIA's Licensing Investigation file that will be part of the record in those administrative appeals does not contain any transcripts of any interviews of Erie and its employees and representatives. Nor may the record contain any documents generated in the Market Conduct Examination. Even the documents cited

in the Determination Letters, and the Determination Letters themselves, are not permitted to be part of the MIA's administrative Licensing Investigation file.  Ins. § 2-209.

91.    The Administration and Defendant Birrane have knowingly placed Erie in the position of having to choose to waive all of the statutory and other confidentiality privileges and protections applicable to the Market Conduct Materials, attorney-client privilege and work product protection in order to present a defense in the administrative appeals of the Determination Letters.

**XI.    The Determination Letters Are Replete With Confidential, Privileged And Protected Information And References To Confidential Documents That Erie Produced During The Ongoing Market Conduct Examination.**

92.    The Administration concedes, in all four Determination Letters, that the MIA transferred confidential Erie Market Conduct Materials to the Property and Casualty Division.

93.    These are four concessions that the MIA transferred confidential, privileged and protected documents and information that Erie produced in an ongoing Market Conduct Examination to the P&C Division, where no such confidentiality protections apply.

94.    The Administration did not request permission from Erie to make this transfer, nor did the MIA even inform Erie that the transfer had been made until after the Determination Letters were published on May 24, 2023. Erie was never permitted to be heard on this issue.

95.    Had Erie been afforded an opportunity to be heard, Erie would have challenged the MIA's illegal release of confidential, privileged and protected information under § 2-209(g), under the same privilege that Commissioner Larsen endorsed in both *Chinwuba* and *Nagy*, *supra*.

96.    The Administration and Market Conduct Division either: (1) did not require the P&C Division to maintain the confidentiality of the transferred documents and information, as required by § 2-209(h); or (2) the MIA's P&C Division violated its §§ 2-209(g), (h) confidentiality

obligations by describing numerous documents and information produced by Erie in the Market Conduct Examination in the Determination Letters.

97.   All of these documents, which Erie produced under the cloak of § 2-209(g) confidentiality and long-standing MIA practice of respecting confidentiality, privilege and protection, contain highly sensitive Erie commercial business information, and in two instances, attorney-client privileged and work-product protected communications:

a. The Agent Front Line Underwriting Guide described and quoted verbatim on pages three to four of the Determination Letters was produced in the Market Conduct Examination;

b. The Determination Letters describe and quote "Erie's records" concerning the placement of agents on "Level 2 review" even though those records were obtained by the MIA in the Market Conduct Examination;

c. An "Erie document entitled 'Presentation Outline' which includes an agenda for an April 18, 2018 training session for the Erie branch office … which carries out all of Erie's underwriting operations in Maryland," was obtained in the Market Conduct Examination but is quoted and described in each of the four Determination Letters;

d. A "document obtained from Erie" containing notations of "Management Concerns" was obtained in the Market Conduct Examination but is described and quoted verbatim in the four Determination Letters. The references to statements by "Steve T" and "Jim T" are references to protected, privileged and confidential advice that Erie in-house counsel provided in their capacity as Erie's attorneys.

**XII.    The Determination Letters Contain Highly Damaging, And Unfounded, Public Findings Of Erie Discrimination That Directly Arise From The Administration's Violations Of Applicable Law, Privilege And Protections.**

98.    Each of the four Determination Letters contain highly damaging, and unfounded determinations by the Administration that Erie violated §§ 27-503(d) and (f)(1) of the Article in its treatment of Ross, BIN, Welsch and Burley – based entirely on the confidential, privileged and protected documents that are illegally referenced and quoted in the P&C Division's Determination Letters.

99.    Section 27-503(d) prohibits Erie from terminating or amending Ross, BIN, Welsch or Burley's Erie agency agreements for arbitrary, capricious or discriminatory reasons.

100.    Erie never answered ***a single interview question*** from the P&C Division concerning Ross, BIN, Welsch or Burley (because they were never asked any such questions).

101.    Erie even stated in its preliminary March 2022 written response to the Administration concerning the Ross, BIN and Welsch complaints that "***[t]he facts that will be revealed in this investigation*** will show that Erie has not violated Subsection 27-503(d) for multiple reasons." (emphasis added).  This statement confirms Erie's understanding, based on statements from the Administration, that the March 2022 response was merely a first step.

102.    Yet, the P&C Division made a credibility "determin[ation]" that unidentified Erie employees or representatives terminated or amended the Ross, BIN, Welsch, and Burley agency agreements for arbitrary, capricious or discriminatory reasons in the purportedly stayed Licensing "Investigation."

103.    Section 27-503(f)(1) of the Article prohibits Erie from canceling or amending Ross, BIN, Welsch, or Burley's agency agreements "because of an adverse loss ratio experience on the producer's book of business" ***if*** – and only ***if***: (1) Erie "required the insurance producer to submit

20

the application [for the risk] for [Erie's] underwriting approval"; (2) all material information on the application was completed; ***and*** (3) the insurance producer did not omit or alter any information provided by the applicant."

104. Erie never sent the P&C Division ***any*** application from ***any*** insured (because Erie was never asked to do so). Erie never answered ***any interview question*** from the P&C Division concerning any insurance application (because Erie was never asked any interview question).

105. In fact, Erie expressly noted that the Administration was required to analyze the underlying applications as a prerequisite of any finding of a violation of § 27-503(f)(1), yet the MIA arbitrarily, capriciously and unlawfully skipped this essential step.

106. None of the Administration's four Determination Letters contain any findings concerning any of the three prerequisite § 27-503(f)(1) statutory factors, so the Administration's analysis is facially incomplete, arbitrary and capricious.

107. Yet, the Administration makes the baseless and highly damaging public finding, in each of the P&C Division's Determination Letters, that "the ***loss ratio metrics*** that Erie adopted were designed to target agencies writing business in urban areas with large minority populations and to reduce the volume if business being written in those areas."   (Emphasis added).

108. The P&C Division also makes baseless and highly damaging public findings, in each of the P&C Division's Determination Letters, that Erie's terminations of the Ross and Welsch agency agreements, and Erie's "imposition of commission reductions and other penalties" as to Ross, BIN, Welsch and Burley were improperly imposed by Erie because those four producers "***did not meet the loss ratio requirements*** unlawfully imposed by Erie on its appointed agents and, further, that ***Erie utilized proxy metrics*** as the justification for the imposition of these penalties in order to accomplish its unlawful objectives." (emphasis added).

109.    The P&C Division determined that the reasons for Erie's issuance of commission reductions, terminations and other penalties on Ross, BIN and Welsch were pretextual ***without the Division ever even asking Erie in an interview to explain why*** Erie issued those reductions, terminations or alleged other penalties.  The P&C Division arbitrarily and capriciously guessed at a credibility determination as to Erie without ever asking anyone from Erie a single interview question, and then published the unfounded determinations.

110.    The Administration's many violations of § 2-209(g), Maryland state and federal caselaw, MIA practices, and other laws have caused an inordinate amount of business reputation damage and prejudice to Erie.

111.    The MIA e-mailed the Determination Letters to Ross, BIN and Welsch, and their counsel, as well as Burley.

## XIII.    The Determination Letters Order Erie To Provide Unlawful Remedies To Ross, Welsch, BIN, And Burley.

112.    The MIA is a remedial administrative agency that is charged with protecting Maryland consumers.

### A.    The P&C Division Has Unlawfully Ordered Erie To Enter Into Private Contracts With Ross And Welsch.

113.    Erie terminated Ross' Erie agency agreement because Ross displayed poor underwriting practices, substandard policyholder service, and low engagement in Erie educational events for more than a decade.

114.    Erie similarly terminated Welsch due to poor underwriting practices, unacceptable policyholder service demonstrated for many years, along with broken trust.

115.    Erie patiently worked with both Ross and Welsch for many years to attempt to improve the accuracy of the applications that Ross and Welsch submitted to Erie.  Erie also received

numerous policyholder complaints from consumers who could not timely reach Ross and Welsch to discuss or make material updates or changes to the Erie policies and products that Ross and Welsch had sold them.

116.    These years-long efforts are well documented, but the P&C Division did not ask Erie a single question about these efforts.

117.    Both Ross and Welsch were issued warning letters by Erie, and both failed to materially improve.

118.    After Erie terminated Ross and Welsch, Erie received complaints from policyholders whom both Ross and Welsch had transferred to Nationwide Insurance Company, and from whom Welsch transferred to Travelers, without the policyholders' knowledge or approval. Erie and Nationwide reported this illegal conduct to the Administration, but, upon information and belief, the Administration has not issued any order against Ross or Welsch.

119.    Welsch has also made documented misrepresentations to the Administration and to Erie:

    a.  Welsch's Administrative Complaint contains allegations that Welsch was terminated by Erie due to racial and geographic discrimination. The Welsch Lawsuit reiterates this false allegation. Welsch recently filed an Amended Complaint in the Welsch Lawsuit that contains allegations that are irreconcilably inconsistent with the allegations in Welsch's Administrative Complaint and original Welsch Lawsuit complaint.

    b.  In Welsch's Amended Baltimore City Circuit Court Complaint, Welsch alleges that Erie terminated Welsch due to a flaw in Erie's Baltimore City pricing, and specifically not due to discriminatory motives. Welsch now alleges that Erie did

23

not want Welsch selling in Baltimore City because Erie recognized that Erie had underpriced City insurance, *__not__* because Erie discriminates against Baltimore City residents based on race.

120.    Neither the Administration, the Commissioner nor the P&C Division have constitutional authority to order Erie to enter into any private contract with Ross or Welsch.  This is particularly so given that Ross and Welsch have demonstrated themselves to be deficient in their operations, unwilling to improve, and in Welsch's case, untrustworthy.  The orders to reinstate Ross and Welsch's Erie agency agreements are arbitrary and capricious.

### B. The P&C Division Has Unlawfully Ordered Erie To Pay Back Commissions To Ross, BIN, Welsch And Burley.

121.    As noted above, the P&C Division's finding that Erie unlawfully reduced Ross, BIN, Welsch and Burley's commissions is entirely unfounded because the finding is based on documents the Division was provided in violation of §§ 2-209(g), Maryland law and long-standing MIA practice.

122.    The P&C Division's finding that Erie unlawfully relied on loss ratio in reducing commissions is erroneous as a matter of law, in addition to being factually unfounded, because the Division has not identified *__any__* instances in which: (1) Erie required Ross, BIN, Welsch or Burley to submit any application for underwriting approval; (2) all material information on the application was completed; (3) Ross, BIN, Welsch or Burley did not omit or alter any information on the application; nor (4) does the Administration tie any of these (non-existent) applications to any reductions in Ross, BIN, Welsch or Burley's commissions.  Article § 27-503(f)(1).

123.    The P&C Division's restitution order is also overbroad, as it requires restitution of any commissions during years-long timeframes, without any consideration of policyholders that

24

requested not to work with Ross, BIN, Welsch, or Burley any further, or other mitigating factors that would require reduction of commissions from the restitution amount.

124.    Restitution is an equitable remedy, and the P&C Division's unfounded restitution order is facially, and substantively, imprecise and inequitable.

**XIV.    The Administration And Commissioner Intend To Unlawfully Disseminate The Determination Letters And Market Conduct Materials As Part Of Administrative Hearings.**

125.    After Erie requested administrative hearings ("Administrative Hearings") on the Determination Letters, the Administration issued follow-up determinations announcing the MIA's intent to provide the unlawful Determination Letters, as well as the underlying source document Market Conduct Materials, to an MIA hearing officer in advance of the Administrative Hearings.

126.    If the Determination Letters and underlying source document Market Conduct Materials are provided to the hearing officer, they are no longer subject to the § 2-209 confidentiality, privilege and other protections that applied when the Administration obtained the Materials to the Administration in the Market Conduct Examination.

127.    Ross, BIN, Welsch, Burley and third parties will have the opportunity to request copies of the Determination Letters and Market Conduct Materials from the hearing officer, and no § 2-209 protections will apply, absent an order of this Court.

128.    The hearing officer will also impermissibly be provided the quotations of the Market Conduct Materials and the source documents, thereby tainting the hearing, absent an order of this Court.

129.    The Administration's findings in the Determination Letters are materially based on the source Market Conduct Materials.

130.    Erie thus does not have any legitimate administrative remedy that does not materially, and impermissibly, involve and implicate the Market Conduct Materials.

131.    The Administration and Commissioner have violated Maryland law, and Erie's federal and State due process rights, by forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the administrative hearing.

<u>**COUNT I**</u>

**(Declaratory Judgment)**

132.    Erie hereby incorporates by reference and realleges each and every allegation in the preceding paragraphs.

133.    There is an actual, justiciable controversy between Erie, the MIA and the Commissioner that warrants issuance of a declaratory judgment.

134.    Erie is entitled to a declaration of this Court that the Administration and the Commissioner's issuance of the Determination Letters was unlawful, because:

a.    The MIA and the Commissioner improperly and illegally disseminated confidential, privileged and protected information obtained in the Market Conduct Examination when the MIA released and published the Determination Letters;

b.    The MIA and Commissioner, through issuance of the Determination Letters, have violated: (1) § 2-209 of the Article; (2) *Chinwuba, supra*, and *Nagy, supra* and their progeny; (3) the Administration's long-recognized privilege accorded to confidential market conduct materials; and (4) the MIA's "long standing" policy and procedure of protecting the confidentiality of market conduct materials;

c. The MIA and Commissioner, through issuance of the Determination Letters, have unlawfully and improperly publicized Erie's attorney-client privileged and work product protected materials;

d. The MIA and the Commissioner, through issuance of the Determination Letters, have substantially and irrevocably infringed upon Erie's substantive and procedural due process rights, guaranteed under the Fourteenth Amendment to the United States Constitution and Article Twenty-Four of Maryland's Declaration of Rights.

e. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by abandoning the MIA's lawful determination that the Phase I Market Conduct Examination should be completed prior to the Administration conducting the Phase II Licensing Examination, without identifying any legitimate regulatory or other purpose for the reversal;

f. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by issuing the Determination Letters in the Phase II Licensing Investigation without interviewing Erie in the Licensing Investigation, and by making credibility determinations as to Erie in the Licensing Investigation without asking Erie any interview questions in the Licensing Investigation;

g. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by issuing a determination that Erie's setting of a uniform, statewide loss ratio goal

for all of Erie's Maryland producers, without regard to the clientele that the producers serve, is unfairly discriminatory;

h. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by determining that Erie should discriminate against Erie's Maryland producers who have not yet written business in Baltimore City by holding those producers to a different, and more exacting loss ratio goal solely due to the fact that those producers have not yet written business in Baltimore City, though each such producer is authorized to do so, is unfairly discriminatory;

i. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by setting one loss ratio goal for producers who have sold policies in Baltimore City, and another loss ratio goal for producers who have not yet sold policies in Baltimore City, without regard to any other geographic regions of the State in which the producers sell, and without apportioning the goals to the percentage of sales those producers make in those regions;

j. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by determining that Erie has acted in a discriminatory manner by failing to set different loss ratio goals for Erie's Maryland producers based on the geographic makeup of their clientele;

k. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by

28

finding that Erie discriminated against the citizens of Baltimore City by setting a general frontline underwriting protocol for all of Erie's producers to utilize in all of the States in which Erie sells insurance, when the majority of producers who are subject to the protocol are not licensed in Maryland, and are not permitted to sell in Maryland or Baltimore City;

l. The MIA and Commissioner, through issuance of the Determination Letters, have otherwise impermissibly acted in an arbitrary and capricious manner in the exercise of their authority; and

m. The MIA and Commissioner have acted arbitrarily and capriciously, and with improper purpose and motive, violated Maryland law, and Erie's federal and State due process rights, by forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the Administrative Hearings; and

n. The MIA and Commissioner will have acted arbitrarily and capriciously, and with improper purpose and motive, violated Maryland law, and Erie's federal and State due process rights, if the Administration and Commissioner disseminate the Market Conduct Materials to the hearing officer in the Administrative Hearings, Ross, BIN, Welsch, Burley or their counsel, or the public.

135. This Court possesses subject matter jurisdiction concerning this controversy, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

136. The MIA's and Commissioner's wrongful acts will continue unless enjoined by this Court.

137. Ross, BIN, Welsch, their respective counsel, and Burley may further disseminate these wrongfully issued determinations unless enjoined by this Court.

138. The MIA's and the Commissioner's acts have caused, and will continue to cause, irreparable injury to Erie for which Erie has no adequate remedy at law.

WHEREFORE, the Erie Plaintiffs respectfully demand a judgment declaring the Administration and Commissioner's issuance of the Determination Letters to have been unlawful and in violation of the Erie Plaintiffs' constitutional rights, as well as such other and further relief that the Court deems just and appropriate.

## COUNT II

**(42 U.S.C. § 1983 – Violation Of Erie's Substantive Due Process Rights)**

139. Erie hereby incorporates by reference and realleges each and every allegation in the preceding paragraphs.

140. 42 U.S.C. § 1983 states, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

141. Section 1983 further provides that "injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

142. The MIA's acts and the Commissioner's acts constitute multiple violations of Erie's substantive due process rights guaranteed under the United States Constitution.

143. As licensed insurance companies in the State of Maryland, each Plaintiff maintains a cognizable property interest in its license.

144. The MIA and Commissioner's acts unlawfully interfered with and deprived each Plaintiff of that property right.

145. The MIA and Commissioner's acts were arbitrary, capricious, irrational, and unjustified to further any legitimate governmental interest.

146. The MIA and Commissioner acted with improper purpose and motive.

147. The MIA and the Commissioner have deprived Erie of its recognized property interests by:

   a. Releasing confidential, privileged and protected documents and information produced in the Market Conduct Examination in direct violation of § 2-209(g), Maryland case law, and the Administration's long-standing and recognized practice and privilege applicable to materials collected and generated in market conduct examinations prior to the issuance of a final market conduct report;

   b. Issuing the Determination Letters without engaging in the Phase II Licensing Investigation that the Administration determined was required in connection with the allegations made in the Administrative Complaints, but "stayed";

   c. Consistently misrepresenting to Erie that the Licensing Investigation would be conducted, and that the Phase II Licensing Investigation would be conducted after completion of the Phase I Market Conduct Examination, and then arbitrarily and capriciously issuing the four public Determination Letters without having conducted the Licensing Investigation;

   d. Issuing illegal Determination Letters with unfounded findings that are highly damaging to Erie;

    e.   Unlawfully requiring Erie to enter into written contracts with Defendants Ross and Welsch;

    f.   Unlawfully ordering Erie to pay commissions to Ross, BIN, Welsch and Burley to which neither Ross, BIN, Welsch nor Burley is entitled;

    g.   Arbitrarily and capriciously, and with improper motive, establishing an unfounded precedent of discrimination that is highly damaging to Erie's licensed business in Maryland and beyond, publicizing the unfounded precedent, and illegally publicizing Erie's confidential business information, attorney-client privileged and work product protected information;

    h.   Arbitrarily and capriciously, and with improper purpose and motive, forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the Administrative Hearings; and

    i.   Arbitrarily and capriciously, and with improper purpose and motive, threatening to disseminate or disseminating the Market Conduct Materials to the hearing officer in the Administrative Hearings, Ross, BIN, Welsch, Burley or their counsel or the public.

148.    The MIA's acts and the Commissioner's acts have caused, and will continue to cause, irreparable injury to Erie for which Erie has no adequate remedy at law.

WHEREFORE, the Erie Plaintiffs respectfully demands judgment against all Defendants for injunctive relief: (1) prohibiting the further dissemination of the Determination Letters; and (2) directing the Administration to withdraw the Determination Letters.

## COUNT III

### (42 U.S.C. § 1983 – Violation Of Erie's Procedural Due Process Rights)

149.    Erie hereby incorporates by reference and realleges each and every allegation in the preceding paragraphs.

150.    The MIA's acts and the Commissioner's acts constitute multiple violations of Erie's procedural due process rights guaranteed under the United States Constitution.

151.    As licensed insurance companies in the State of Maryland, each Plaintiff maintains a cognizable property interest in its license.

152.    The MIA and Commissioner's acts unlawfully interfered with and deprived each Plaintiff of that property right.

153.    The procedures employed by the MIA and Commissioner were constitutionally inadequate.

154.    The procedures employed by the MIA and Commissioner have deprived Erie of its recognized property interests by:

      a. Releasing confidential, privileged and protected documents and information produced in the Market Conduct Examination in direct violation of § 2-209(g), Maryland state and federal case law, and the Administration's long-standing and recognized practice and privilege applicable to materials collected and generated in market conduct examinations prior to the issuance of a final market conduct report;

      b. Issuing the Determination Letters without engaging in the Phase II Licensing Investigation that the Administration determined was required in connection with

the allegations made in the Administrative Complaints, but, in its discretion, "stayed";

c. Consistently misrepresenting to Erie that the Licensing Investigation would be conducted, and that the Phase II Licensing Investigation would be conducted after completion of the Phase I Market Conduct Examination, and then arbitrarily and capriciously issuing the four public Determination Letters without having conducted the Licensing Investigation;

d. Issuing illegal Determination Letters, with unfounded findings that are highly damaging to Erie;

e. Unlawfully requiring Erie to enter into written contracts with Defendants Ross and Welsch;

f. Unlawfully ordering Erie to pay commissions to Ross, BIN, Welsch and Burley to which neither Ross, BIN, Welsch nor Burley is entitled;

g. Arbitrarily and capriciously, and with improper motive, establishing an unfounded precedent of discrimination that is highly damaging to Erie's licensed business in Maryland and beyond, publicizing the unfounded precedent, and illegally publicizing Erie's confidential business information, attorney-client privileged and work product protected information;

h. Arbitrarily and capriciously, and with improper purpose and motive, forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the Administrative Hearings; and

i.  Arbitrarily and capriciously, and with improper purpose and motive, threatening to disseminate or disseminating the Market Conduct Materials to the hearing officer in the Administrative Hearings, Ross, BIN, Welsch, Burley or their counsel or the public.

155.    Erie has no opportunity to challenge the acts of the MIA and the acts of the Commissioner.

156.    The MIA and the Commissioner have deprived Erie of its recognized property interests by issuing the unlawful Determination Letters, unlawfully ordering Erie to enter into contracts with Ross and Welsch, unlawfully ordering Erie to pay back commissions to Ross, BIN, Welsch and Burley, establishing an unfounded precedent of discrimination that is highly damaging to Erie's licensed business in Maryland and beyond, publicizing the unfounded precedent, and illegally publicizing Erie's confidential business information, attorney-client privileged and work product protected information.

157.    The MIA's acts and the Commissioner's acts have caused, and will continue to cause, irreparable injury to Erie for which Erie has no adequate remedy at law.

WHEREFORE, the Erie Plaintiffs respectfully demands judgment against all Defendants for injunctive relief: (1) prohibiting the further dissemination of the Determination Letters; and (2) directing the Administration to withdraw the Determination Letters.

## COUNT IV

### (Article 24 of the Maryland Declaration of Rights – Due Process)

158.    Erie hereby incorporates by reference and realleges each and every allegation in the preceding paragraphs.

159.    Article 24 of the Maryland Declaration of Rights provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

160.    As licensed insurance companies in the State of Maryland, each Plaintiff maintains a cognizable property interest in its license.

161.    The MIA and Commissioner's acts unlawfully interfered with and deprived each Plaintiff of that property right.

162.    Article 24 of the Maryland Declaration of Rights is interpreted *in pari materia* with the rights and guarantees afforded under the Fourteenth Amendment to the United States Constitution.

163.    By the acts described above, the MIA and the Commissioner have deprived Erie of its property interests, in violation of its due process rights, by:

   a. Releasing confidential, privileged and protected documents and information produced in the Market Conduct Examination in direct violation of § 2-209(g), Maryland State and federal case law, and the Administration's long-standing and recognized practice and privilege applicable to materials collected and generated in market conduct examinations prior to the issuance of a final market conduct report;

   b. Issuing the Determination Letters without engaging in the Phase II Licensing Investigation that the Administration determined was required in connection with the allegations made in the Administrative Complaints, but stayed;

c.  Consistently misrepresenting to Erie that the Licensing Investigation would be conducted, and that the Phase II Licensing Investigation would be conducted after completion of the Phase I Market Conduct Examination, and then arbitrarily and capriciously issuing the four public Determination Letters without having conducted the Licensing Investigation;

d.  Issuing illegal Determination Letters, with unfounded findings that are highly damaging to Erie;

e.  Unlawfully requiring Erie to enter into written contracts with Defendants Ross and Welsch;

f.  Unlawfully ordering Erie to pay commissions to Ross, BIN, Welsch and Burley to which neither Ross, BIN, Welsch nor Burley is entitled;

g.  Arbitrarily and capriciously, and with improper motive, establishing an unfounded precedent of discrimination that is highly damaging to Erie's licensed business in Maryland and beyond, publicizing the unfounded precedent, and illegally publicizing Erie's confidential business information, attorney-client privileged and work product protected information;

h.  Arbitrarily and capriciously, and with improper purpose and motive, forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the Administrative Hearings; and

i.  Arbitrarily and capriciously, and with improper purpose and motive, threatening to disseminate or disseminating the Market Conduct Materials to the hearing

officer in the Administrative Hearings, Ross, BIN, Welsch, Burley or their counsel or the public.

164. The MIA's acts and the Commissioner's acts have caused, and will continue to cause, irreparable injury to Erie for which Erie has no adequate remedy at law.

WHEREFORE, the Erie Plaintiffs respectfully demands judgment against all Defendants for injunctive relief prohibiting: (1) the further dissemination of the Determination Letters; and (2) directing the Administration to withdraw the Determination Letters.

## **PRAYER FOR RELIEF**

WHEREFORE, Erie prays that:

1. That this Court issue an Order declaring the Determination Letters to be unlawful because:

    a. The MIA and the Commissioner improperly and illegally disseminated confidential, privileged and protected information obtained in the Marked Conduct Examination when the MIA released and published the Determination Letters;

    b. The MIA and Commissioner, through issuance of the Determination Letters, have violated: (1) § 2-209 of the Article; (2) holdings of *Chinwuba, supra*, and *Nagy, supra* and their progeny; (3) the Administration's long-recognized privilege accorded to confidential market conduct materials; and (4) the MIA's "long standing" policy and procedure of protecting the confidentiality of market conduct materials;

    c. The MIA and Commissioner, through issuance of the Determination Letters, have unlawfully and improperly publicized Erie's attorney-client privileged and work product protected materials;

d. The MIA and the Commissioner, through issuance of the Determination Letters, have substantially and irrevocably infringed upon Erie's substantive and procedural due process rights, guaranteed under the Fourteenth Amendment to the United States Constitution and Article Twenty-Four of Maryland's Declaration of Rights;

e. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by abandoning the MIA's lawful determination that the Phase I Market Conduct Examination should be completed prior to the Administration conducting the Phase II Licensing Examination;

f. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by issuing the Determination Letters in the Phase II Licensing Investigation without interviewing Erie in the Licensing Investigation, and making credibility determinations as to Erie in the Licensing Investigation without asking Erie any interview questions in the Licensing Investigation;

g. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by issuing a determination that Erie's setting of a uniform, statewide loss ratio goal for all of Erie's Maryland producers, without regard to the clientele that the producers serve, is unfairly discriminatory;

h. The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by determining that Erie should discriminate against Erie's Maryland producers who

have not yet written business in Baltimore City by holding those producers to a different, and more exacting loss ratio goal solely due to the fact that those producers have not yet written business in Baltimore City, though each such producer is authorized to do so;

i.  The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by setting one loss ratio goal for producers who have sold policies in Baltimore City, and another loss ratio goal for producers who have not yet sold policies in Baltimore City, without regard to any other geographic regions of the State in which the producers sell, and without apportioning the goals to the percentage of sales those producers make in those regions;

j.  The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by determining that Erie has acted in a discriminatory manner by failing to set different loss ratio goals for Erie's Maryland producers based on the geographic makeup of their clientele;

k.  The MIA and Commissioner, through issuance of the Determination Letters, have acted arbitrarily and capriciously, and with improper purpose and motive, by finding that Erie acted to discriminate against the citizens of Baltimore City by setting a general frontline underwriting protocol for all of Erie's producers to utilize in all of the States in which Erie sells insurance, when the majority of producers who are subject to the protocol are not licensed in Maryland, and are not permitted to sell in Maryland or Baltimore City;

l.  The MIA and Commissioner, through issuance of the Determination Letters, have otherwise impermissibly acted in an arbitrary and capricious manner in the exercise of their authority;

m.  The MIA and Commissioner have acted arbitrarily and capriciously, and with improper purpose and motive, violated Maryland law, and Erie's federal and State due process rights, by forcing Erie to waive its confidentiality, privilege and other protections attaching to the Market Conduct Materials in order to present its case in the Administrative Hearings; and

n.  The MIA and Commissioner will have acted arbitrarily and capriciously, and with improper purpose and motive, violated Maryland law, and Erie's federal and State due process rights, if the Administration and Commissioner disseminate the Market Conduct Materials to the hearing officer in the Administrative Hearings, Ross, BIN, Welsch, Burley or their counsel, or the public.

2.  All Defendants and all of their respective agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through or under authority from any or all Defendants, or in concert or participation with any Defendant, and each of them, be restrained and enjoined from disseminating the Determination Letters to any person or entity through a temporary restraining order, and preliminary and permanent injunctive relief;

3.  Defendants be directed to publicly withdraw the Determination Letters as issued in violation of Maryland law; and that

4.  Erie be granted such other and further relief as the Court may deem just.

41

## JURY DEMAND

Erie hereby demands a trial by jury on all claims and issues so triable.

Dated: June 8, 2023                    Respectfully submitted,

_____/s/Alex J. Brown_____

Alex J. Brown (Bar No. 26612)
Michael S. Bullock (Bar No. 21251)
Shapiro, Sher, Guinot & Sandler, P.A.
250 W. Pratt Street, Suite 2000
Baltimore, Maryland 21201
Phone: 410.385.0202
Fax: 410.539.7611
ajb@shapirosher.com
msb@shapirosher.com

*Attorneys for Plaintiffs Erie Insurance Exchange, Erie Insurance Company, Erie Insurance Property & Casualty Company, Erie Family Life Insurance Company, Erie Insurance Company of New York, and Flagship City Insurance Company*

42